# Supreme Court of Florida

---

No. SC2024-0931

---

**TINA LASONYA BROWN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

July 16, 2026

FRANCIS, J.

Tina Brown, a prisoner under sentence of death, appeals the denial of her successive motion for postconviction relief and motion for public records, which are ultimately aimed at discrediting the trial testimony of co-perpetrator, Heather Lee. We affirm.[1]

## I.

### A. Background

In 2010, Brown, Brown's sixteen-year-old daughter Britnee Miller, and Heather Lee kidnapped Audreanna Zimmerman, beat

---

1. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.

her with a crowbar, stunned her with a stun gun, and set her on fire. As part of a plea to second-degree murder, one of the perpetrators, Lee, testified in Brown's trial that she, Brown, Miller, and Zimmerman were initially good friends, but the relationship with Zimmerman became volatile after Miller discovered Zimmerman was having a sexual affair with her boyfriend. According to Lee, Miller attacked Zimmerman one day, and Zimmerman defended herself with a stun gun. Lee later told Brown that Zimmerman used a stun gun on her daughter and reported that Brown said she was "going to get" Zimmerman. *Brown v. State* (*Brown I*), 143 So. 3d 392, 395 (Fla. 2014). An inmate housed with Brown in jail, Corie Doyle, corroborated Lee's testimony, testifying that Brown said she told Miller, "don't worry, I'll take care of it" after hearing about the stun gun altercation. *Id.* at 403.

M.A., a thirteen-year-old friend of Miller's, testified at trial that on the day Zimmerman was killed, she was present when Brown initiated the attack on Zimmerman with a stun gun and used the stun gun on her multiple times. She also testified that Brown forced Zimmerman into the trunk of the car and thought that Miller drove the car away with Brown and Lee inside.

Lee's testimony about what happened *before* driving the car away was consistent with M.A.'s, and she further testified to what happened *after* they drove away.[2] Lee testified that they drove Zimmerman to the woods where Brown and Miller beat Zimmerman with a crowbar. Brown then poured gasoline on a still conscious Zimmerman, set her on fire, and watched as the screaming Zimmerman burned. Brown, Miller, and Lee left, and Zimmerman was able to walk to a nearby home for help. She told a responding EMT that Brown and Lee were her attackers and gave him their addresses. Later inside an ambulance, she told the paramedic that Brown, Miller, and Lee poured gasoline on her and set her on fire. Zimmerman ultimately succumbed to her injuries and died sixteen days later.

At trial, Brown's cellmate, Doyle, further testified that Brown admitted she, Miller, and Lee "picked up the victim and beat her up and ta[s]ed her and set her on fire." *Brown v. State* (*Brown II*), 304 So. 3d 243, 253 (Fla. 2020). Doyle testified that Brown also told her that Lee was there but "didn't have anything to do with it." *Id.*

_____

2. Though Lee testified that Brown was driving.

- 3 -

Additionally, the State presented forensic evidence showing Brown's DNA was found on the stun gun.

Based on the foregoing evidence, the State argued that Brown initiated the entire criminal episode and had the sole motive to murder Zimmerman, which was revenge on Zimmerman for using a stun gun on her daughter, Miller. The State also argued that, based on Lee's testimony, it was Brown and only Brown who killed Zimmerman by dousing her with gasoline and lighting her on fire. In arguing for the death penalty, the State argued that Brown had the greatest level of involvement in the crime.

Brown was convicted of first-degree murder and, following a unanimous jury recommendation, sentenced to death. The trial court found the following aggravators: (1) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (great weight); (2) the murder was especially heinous, atrocious, or cruel (HAC) (great weight); and (3) the murder was committed while Brown was engaged in the commission of a kidnapping (significant weight). We affirmed her conviction and sentence on appeal. *See Brown I,* 143

So. 3d at 395.[3]  Notably during the *Spencer*[4] hearing, Brown

admitted she participated in Zimmerman's murder.

In 2015, Brown filed her initial motion for postconviction relief.

Following an evidentiary hearing, the trial court denied all claims,

including a claim of ineffective assistance of trial counsel for failing

to adequately challenge the State's guilt phase evidence through

cross-examination of witnesses Lee and Doyle, and a claim of newly

discovered evidence related to (a) Lee's credibility as a witness and

(b) her more central role in instigating the murder.[5]

We affirmed the denial of Brown's postconviction claims

concerning Lee's role and her credibility because while "the

additional impeachment of Lee *might* result in a lesser sentence at a

---

3.  Brown also presented mitigation evidence, which is further discussed under Section II of this opinion.

4.  *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

5.  Brown specifically pointed to an email from Lee's trial attorney, which was disclosed to Brown's counsel without authorization; posttrial confessions by Lee to fellow inmates; and evidence of Lee's pattern of violence against individuals, like the victim, who engaged in affairs with Lee's partners.  Additionally, Brown presented evidence of Lee's potential motive: that Lee's husband, Darren Lee, had an affair with both Zimmerman and Brown, meaning Lee may have had a motive for the murder.

retrial," we could not say "that it *would probably* result in a lesser sentence." *See Brown II*, 304 So. 3d at 277.[6] This was because of the overwhelming evidence that Brown had a significant role in the murder, which included forensic evidence, the victim's dying declaration, and the eyewitness testimony of M.A. concerning Brown's role as the initial aggressor in her trailer. And we noted that were there a retrial, the jury would hear Brown's *Spencer* hearing admission.

We also denied Brown's habeas petition in which she asserted that appellate counsel was ineffective for failing to challenge the prosecutor's statements to the jury concerning Doyle. *Id.* at 279-80.[7]

---

6. On appeal, Brown raised the following ineffective assistance of trial counsel (IAC) claims: (1) IAC during jury selection for failing to strike juror Taylor for cause; (2) IAC during the guilt phase for (a) failing to adequately challenge the State's evidence through cross-examination of witnesses Heather Lee and Corie Doyle and (b) failing to present witnesses Darren Lee, Terrance Woods, and Nicole Henderson for purposes of impeachment; (3) IAC during the penalty phase for (a) failing to conduct a reasonably competent mitigation investigation and present adequate mitigation and (b) failing to consult and present additional mental health experts; and (4) she was denied a fundamentally fair trial based on cumulative IAC during the guilt and penalty phases.

7. In her habeas petition, Brown also raised a claim of

- 6 -

## B. Successive Postconviction Motion & Evidentiary Hearing

Brown filed a successive motion for postconviction relief in August 2022, raising a newly discovered evidence claim centered on the recantation of prosecution trial witness Doyle (Brown's cellmate) and the supporting affidavit and testimony of Latoria Frazier (Doyle's former cellmate who also knows Lee).[8]

Brown attached an affidavit from Doyle to her postconviction motion. In the affidavit, Doyle claimed Lee threatened her in prison to get her to testify that Brown's motive for the crime was a fight between Miller and Zimmerman over a boy and that Lee was not involved in the murder but knew about it. Doyle further claimed in her affidavit that, contrary to her trial testimony, Lee told her that she was involved in Zimmerman's death. Doyle claimed Lee told her that both she and Brown attacked Zimmerman with a taser (stun gun). Doyle also claimed that Lee held onto Zimmerman's

---

ineffective assistance of appellate counsel for failing to challenge the prosecutor's unobjected-to statement during closing that Brown is a "cold-blooded murderer." *Id.* at 279.

8.  Brown also attached the affidavit of Iris Moreland, who was previously housed with Lee. Lee told her that she bought the gas used in the murder and that the "bitch deserved to die."

hair in the car during the kidnapping and stunned her whenever she pleaded to be released, but in a later corrected affidavit, Doyle struck the sentence about Lee holding Zimmerman's hair.[9]

Frazier's affidavit stated that Doyle told her in the early 2010s that Lee asked Doyle to testify in Lee's case and lie in court. Frazier advised Doyle not to do it and to stay away from Lee.

Brown argued in her motion that Doyle's recantation would probably result in an acquittal on retrial or a lesser sentence at a new penalty phase. In support of a lesser sentence, Brown also attached the reports of three mitigation experts to her motion.

The postconviction court granted an evidentiary hearing. After having received derivative use immunity, Doyle testified in contradiction to her trial testimony that Brown never spoke to her about her case while they were incarcerated together. Instead, Doyle claimed that she overheard Brown talking to Miller and other inmates about the case and thought she heard Brown say that the

---

9. There are two affidavits by Doyle: the one attached to the motion, which contains corrections to the spelling of Frazier's name, and a corrected affidavit admitted during the evidentiary hearing. The corrected affidavit contains multiple corrections with some sentences totally struck-through.

murder was motivated by an incident between the victim and Miller, though she could not remember specifics. She testified that Lee threatened her in prison and instructed her to lie about Brown on Lee's behalf. She said she did not recant earlier because she was still afraid of Lee and felt uncomfortable talking with defense investigators about the case. She finally recanted to Brown's federal investigator, Nels Roderwald, in late 2021 because he "seemed genuine" and she felt comfortable with him.

However, when questioned about her affidavit, Doyle testified that she did not know the document she signed for Roderwald was an affidavit, that she did not read it before signing, and that Roderwald did not go over each line with her. Instead, she testified that Roderwald pressured her into making a statement and into saying certain things, such as that it was Lee's husband who was the motivating factor in the murder. When the State cross-examined Doyle about her past untruthfulness, Doyle threatened to "just . . . say I don't remember anything anymore." She also said she could not remember everything she was being questioned about because it had been many years since the events in question and she had done many drugs since then.

Frazier testified that she knew Doyle from the streets and was incarcerated with her in the Escambia County Jail from 2010 to 2012. She testified that in 2010, Doyle came to her cell crying and told her that Lee was trying to get Doyle to lie in court for her. Frazier acknowledged that Doyle never gave her details on what Lee wanted her to lie about. She also testified that Roderwald was the first person she told about this situation in 2022. Additionally, Frazier acknowledged she wrote a letter for Lee's sentencing hearing, saying Lee was a good person, though she claimed she did not know that Lee had bullied Doyle and asked her to lie back then.

Roderwald testified that he spoke with Doyle approximately four times beginning in late November 2021. He initially noted that Doyle was inconsistent with her trial testimony about previously knowing Lee and why she was in jail. A week later, Doyle told Roderwald that Lee had threatened her to get her to testify in Brown's case. Roderwald prepared an affidavit and asked Doyle to read it. Doyle corrected a misspelling in the affidavit and signed it after being placed under oath. Roderwald denied having pressured Doyle to sign the affidavit.

Defense investigators, Jayson Shannon, Emily Collins, and

Zachary Stern, testified about their earlier contact with Doyle. Shannon and Collins testified that they contacted Doyle in 2018 while she was out of jail and interviewed her to determine if her trial testimony was truthful. Shannon said that Doyle made some statements to him that were inconsistent with her trial testimony, though he could not recall what those were specifically. Collins said that the interview lasted about twenty minutes, but she believed Doyle would not change her trial testimony. Shannon testified that he attempted a second interview with Doyle, but she seemed erratic and to be under the influence of something. Stern also testified that a few years earlier, when he interviewed Doyle several times at the Escambia County Jail in 2016, she appeared scared, uncooperative, and would not speak with him.[10]

Brown also presented additional mitigation evidence from

10. Brown also presented the testimony of several other inmate witnesses: (1) Moreland, who testified consistently with her affidavit that she overheard Lee say she bought the gas used to kill Zimmerman and that Zimmerman deserved to die; (2) Lee, who claimed she had never met Doyle, never threatened anyone, and that Zimmerman's murder had nothing to do with her husband; and (3) Brittany Dean, a former bunkmate of Lee's, who testified that Lee said both she and Brown beat on Zimmerman and put her in the car, and that Lee threatened to burn other inmates.

three expert witnesses: (1) Elizabeth Campbell, a law professor who researches and works with victims of human trafficking, who testified about the negative effects Brown suffered as a result of being trafficked and prostituted as a minor by her father and stepmother in exchange for drugs; (2) Dr. Micah Johnson, a sociologist and assistant professor, who testified that Brown had PTSD and an altered decision-making process resulting from her exposure to an extreme degree of trauma and household and community disadvantage; and (3) Dr. Yenys Castillo, a clinical and forensic psychologist, who opined that Brown suffered hidden incest in her family and an environment where women were expected to submit and be quiet, which affected her ability to love and trust others; and she opined that she suffered multiple head injuries that would make her susceptible to traumatic brain injury, the effects of which can include difficulty regulating emotions, tolerating distress, planning, and remembering things.

## C. Postconviction Order

The postconviction court denied Brown's successive postconviction motion, finding first that the newly discovered evidence claim was untimely. The court reasoned that Frazier's

evidence could have been discovered well before 2022 with due diligence because Frazier wrote a letter for Lee's sentencing in 2012, a decade earlier. The court also reasoned that Doyle's recantation could have been discovered earlier with due diligence given that the defense team met with her many times over the years and she had previously made statements inconsistent with her trial testimony.

The postconviction court also concluded that even if the claim was timely, Doyle's testimony was not credible based on Doyle's failure to provide a credible reason for recanting her testimony years later, the efforts Doyle made at the hearing to disclaim her affidavit, the fact that Doyle had five previous felony convictions including one for a crime of dishonesty, and Doyle's "defensive and antagonistic" demeanor at the evidentiary hearing.

Even if timely and credible, the postconviction court determined that the newly discovered evidence would probably not produce an acquittal at retrial or a lesser sentence given the evidence of Brown's DNA on the stun gun, the victim's dying declaration, M.A.'s testimony that Brown was the primary aggressor at the trailer, and Brown's own incriminating statements about her participation in the murder that she made at the *Spencer* hearing

- 13 -

and to others. The court also determined that the additional mitigation evidence was not enough for a jury to find that Brown was a minor participant and not the primary aggressor. The court further reasoned that the additional mitigation evidence was largely cumulative to the mitigation evidence presented at trial and Brown's initial postconviction proceedings and did not overcome the finding that Brown's decision to murder the victim was the result of cool and calm reflection.

Brown now appeals the order denying her successive postconviction motion, as well as the order denying her motion for public records seeking recordings of Lee's jailhouse phone calls. As explained below, we affirm the postconviction court's orders.

## II.

On appeal, Brown asks this Court to remand for a new penalty phase and does not argue for a new trial. Thus, we address only whether the postconviction court erred in finding that Brown was not entitled to a new penalty phase.

### A. Newly Discovered Evidence Claim

"This Court applies a mixed standard of review to a lower court's rulings on newly discovered evidence claims after an

evidentiary hearing. It reviews findings of fact and credibility determinations for competent, substantial evidence and it reviews the application of law to the facts de novo." *Sheppard v. State*, 338 So. 3d 803, 825 (Fla. 2022) (citing *Marek v. State*, 14 So. 3d 985, 990 (Fla. 2009)).

"To succeed on a claim of newly discovered evidence, [a] defendant must establish [the] two prongs" from *Jones v. State* (*Jones II*), 709 So. 2d 512, 521 (Fla. 1998). *Sheppard*, 338 So. 3d at 825. "First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence." *Calhoun v. State*, 376 So. 3d 583, 585 (Fla. 2023) (quoting *Marek*, 14 So. 3d at 990). Second, "[w]hen a claim of newly discovered evidence is based upon the recantation of testimony by a witness for the prosecution, the second prong of *Jones II* is met only where the defendant first establishes that the recanted testimony is truthful." *Spann v. State*, 91 So. 3d 812, 822 (Fla. 2012) (citing *Davis v. State*, 26 So. 3d 519, 526 (Fla. 2009)). If the recanted testimony is truthful, then the court must determine "whether the newly discovered evidence 'would probably yield a less

severe sentence' on resentencing." *Brown II*, 304 So. 3d at 273 (quoting *Swafford v. State,* 125 So. 3d 760, 767 (Fla. 2013)).

### *1. Timeliness*

"Any motion to vacate judgment of conviction and sentence of death must be filed by the defendant within 1 year after the judgment and sentence become final." Fla. R. Crim. P. 3.851(d)(1). Among the enumerated exceptions to this one-year requirement is a claim of newly discovered evidence, which must meet the first prong of *Jones II* by alleging that "the facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence." Fla. R. Crim. P. 3.851(d)(2)(A).

As to Frazier's testimony, we agree with the postconviction court's finding that Brown's newly discovered evidence claim was untimely. Because Frazier wrote a letter in support of Lee for her sentencing in 2012, Frazier has been known and available to the defense for over a decade and could have been discovered earlier with due diligence.

However, we disagree with the postconviction court that Doyle's recantation could have been discovered earlier with due

- 16 -

diligence because Doyle did not decide to recant until December 12, 2021. *Davis*, 26 So. 3d at 528 (holding that recanted testimony is "discovered" when "the witness chooses to recant" (emphasis omitted)). Thus, the fact that Brown may have been aware of some vague inconsistencies and did not call Doyle as a witness at Brown's initial postconviction evidentiary hearing does not affect when the recanted testimony became discoverable. *See Burns v. State*, 858 So. 2d 1229, 1230 (Fla. 1st DCA 2003) ("Even though the appellant knew at trial that the codefendant was lying, the appellant could not have gotten the codefendant to admit that he was lying earlier, and thus the recantation is newly discovered evidence that could not have been obtained earlier with due diligence."). Thus, the first prong of *Jones II* is satisfied as to Doyle's so-called recantation.

### 2. Credibility

Because Doyle was a prosecution witness, the second prong of *Jones II* cannot be satisfied unless Doyle's recantation and new testimony is found to be truthful. *See Spann*, 91 So. 3d at 822. In considering the credibility of a witness, we give great deference to the trial judge's assessment of the witness's demeanor and other

first-hand observations. *See State v. Spaziano*, 692 So. 2d 174, 178 (Fla. 1997) ("[T]he trial judge is there and has a superior vantage point to see and hear the witnesses presenting the conflicting testimony."); *Spann*, 91 So. 3d at 825 ("[I]n determining whether the record supports the trial court's finding that the recantation was not credible, we give great deference to the trial judge's observations concerning [the recanting witness's] demeanor.").

Whether Doyle gave a credible reason for why she chose to recant,[11] we find that competent, substantial evidence supports the postconviction court's findings that "Doyle gave contradictory statements and made efforts to disclaim her affidavit, and her testimony failed to solidify how she would testify at a retrial." At the evidentiary hearing, the record reflects Doyle testified that she did not know that she signed an affidavit and did not read it, except

---

11. The postconviction court reasoned Doyle failed to give a credible reason because she testified inconsistently, citing that she did not recant in 2018 because she did not feel comfortable speaking to investigators, yet she decided to recant in 2021 because a new investigator, Roderwald, "seemed genuine." But feeling more comfortable with a new investigator is not necessarily inconsistent. She also testified that she gave false testimony at Brown's trial because of her fear of Lee, though, at the evidentiary hearing, she testified that she was still afraid of Lee. But finding the courage to do something while afraid is not necessarily inconsistent.

where she corrected Frazier's name. She also recanted some of the statements in the affidavit. Doyle claimed Roderwald did not go over each line with her and, ultimately, a corrected affidavit was submitted for the hearing showing multiple sentences stricken. Doyle testified that for the statements in the affidavit she did not understand, she either put a line through or underlined the statements. She also testified that "[Roderwald] led [her] into saying certain things," such as "it was [Lee's] husband" that was the motivating factor in the murder. Roderwald denied pressuring her.

Further, the record supports the postconviction court's finding that Doyle was less than a credible witness due to (a) her willingness to "just say she did not remember anything anymore" as a defense to cross-examination and (b) her lack of recollection based on her years of drug abuse. We defer, of course, to the postconviction court's finding that Doyle's demeanor was "defensive and antagonistic." *See Spann*, 91 So. 3d at 825.

Based on this record, we find no error in the postconviction court's finding that Doyle's recantation was not credible and agree that Doyle's potential new testimony was never solidified.

### *3. Probability of a Life Sentence*

Having found no error in the postconviction court's determination that Doyle's unsolidified recantation was not credible, we need not consider whether the postconviction court erred in finding this evidence would not probably result in a lesser sentence following a new penalty phase. But even if we did, we find no error in the postconviction court's order.

Under *Jones II*, "when the penalty phase is at issue, the second prong requires a determination of whether the newly discovered evidence 'would probably yield a less severe sentence' on resentencing." *Brown II*, 304 So. 3d at 273 (quoting *Swafford*, 125 So. 3d at 767). This requires a "consideration of 'whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence,' 'whether the evidence is cumulative to other evidence in the case,' and 'the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.' " *Id.* (quoting *Jones II*, 709 So. 2d at 521). When evaluating these factors,

> this Court considers it in conjunction with not only the
> evidence already presented at trial but also any new
> evidence the movant has developed in postconviction

> proceedings that could be introduced at a new trial, including evidence that has not been considered on its own because it was the subject of a procedurally barred claim.

*Id.* (citing *Hildwin v. State*, 141 So. 3d 1178, 1181, 1184 (Fla. 2014)).

Brown argues that the newly discovered evidence of Doyle's recantation and Frazier's corroborating statements, in addition to other evidence developed in the instant and prior postconviction proceedings, has a likelihood of resulting in a life sentence because the evidence shows that Lee's culpability is heightened and that Brown's is reduced, compared to the State's position at trial. Brown also argues that the testimony of her additional mitigation witnesses shows that she was less culpable due to her childhood trauma and mental health, and that this mitigation evidence would outweigh the CCP aggravator, likely resulting in a life sentence following a new penalty phase.

Even crediting all this evidence and assuming it would be admitted at a new penalty phase, this evidence does not overcome the other evidence showing that Brown was the ringleader. M.A. testified that Brown was the initial aggressor who started the attack

on Zimmerman at Brown's trailer, then forced Zimmerman to the car. And forensic evidence showed that Brown's DNA was found on the stun gun. Thus, independent of the testimony of Lee and Doyle, even if Lee played a greater role in helping to murder Zimmerman, the evidence still supports the conclusion that Brown was the primary aggressor.

Further, the additional mitigation evidence showing that Brown was a victim of sex trafficking, incest, violence, and trauma is not likely to overcome the CCP aggravator because it is largely cumulative to the evidence Brown presented to her initial penalty phase jury through psychologist Dr. Elaine Bailey. Dr. Bailey talked about the stressors and cumulative trauma Brown experienced, including her sexual victimization, that affected Brown at the time of the murder.[12] On the other hand, the State's expert,

---

12. *See Brown II*, 304 So. 3d at 266 n.9 ("Dr. Bailey testified during the penalty phase to the 'stressors' that would have affected Brown at the time of the crime, including 'repeated traumas, addictions, abusive relationships, exposure to violence, a lot of sexual victimization, both in childhood being prostituted and adulthood[,] [and a] lot of community negative influence and crime, and [she explained that] all of those things c[a]me together.' Dr. Bailey also testified that Brown's childhood experiences would have affected her into adulthood, that trauma affects brain development,

Dr. John Bingham, presented testimony supporting the CCP aggravator, telling the jury that he found no indication that Brown's anger and rage inhibited her ability to discern right from wrong or her ability to engage in preplanning.[13] Additionally, none of this would overcome the weighty HAC aggravator, which is supported by the gruesome record facts in this case—the victim was beaten with a crowbar, stunned repeatedly, then set on fire and left to die, ultimately succumbing to those injuries sixteen days later.

Thus, we affirm the postconviction court's finding that Doyle's recantation is not credible, but even if it were, this evidence would not probably result in a lesser sentence at a new penalty phase.

## B. Public Records Claim

Brown also challenges the postconviction court's denial of her

---

and that '[t]he bottom line is trauma is cumulative.'" (alterations in original)).

13. Dr. Bingham also found no indication that Brown's anger and rage inhibited her ability to think and process information rationally and clearly. He testified that during the entirety of the criminal episode, Brown exhibited preplanning, direction, and goal-orientation, which shows that Brown's decision to murder Zimmerman was the product of cool and calm reflection, not an act prompted by emotional frenzy, panic, or a fit of rage. *Brown I*, 143 So. 3d at 403.

public records request for copies of jailhouse calls between Lee and Doyle, which she argued were relevant to Doyle's credibility. We need not address the merits of this issue, however, because, even if the recordings could bolster Doyle's credibility, Doyle's unsolidified recantation would probably not result in a lesser sentence for Brown given the overwhelming evidence of Brown's guilt, the gruesome nature of the crime, and the evidence showing Brown was the primary aggressor.

## III.

For the reasons above, we affirm the postconviction court's denial of Brown's successive postconviction motion and request for public records.

It is so ordered.

COURIEL, C.J., and LABARGA, MUÑIZ, GROSSHANS, and SASSO, JJ., concur.
TANENBAUM, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Escambia County,
    Gary Lee Bergosh, Judge
    Case No. 172010CF001608XXXAXX

Dawn B. Macready, Capital Collateral Regional Counsel, and Chelsea Shirley, Assistant Capital Collateral Regional Counsel, Northern Region, Tallahassee, Florida,

    for Appellant

James Uthmeier, Attorney General, Tallahassee, Florida, and Stephen D. Ake, Senior Assistant Attorney General, Tampa, Florida,

    for Appellee